PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

————————

No. 04-3228

————————

HENRY G. BAXTER,
                                        Appellant

v.

JODY AMANDA BAXTER

————————————

On Appeal from the United States District Court
for the District of Delaware
D.C. Civil Action No. 04-cv-00308
(Honorable Joseph J. Farnan, Jr.)

————————

Submitted Pursuant to Third Circuit LAR 34.1(a)
May 26, 2005

Before:  SCIRICA, *Chief Judge*,
ALITO and GARTH, *Circuit Judges*

(Filed September 15, 2005)

MATT NEIDERMAN, ESQUIRE
Duane Morris LLP
1100 North Market Street, Suite 1200
Wilmington, Delaware 19801
       Attorney for Appellant

GERARD F. GRAY, ESQUIRE
Gray & Associates
13 East Laurel Street
Georgetown, Delaware 19947

GEORGIA L. LEONHART, ESQUIRE
9 McIntosh Court
Lewes, Delaware 19958
       Attorneys for Appellee

————————————

## OPINION OF THE COURT

————————————

SCIRICA, *Chief Judge*.

     This is an appeal from the denial of a petition for the return of a child to Australia under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501. The principal issue is whether the District Court correctly held the petitioner consented to the removal or retention of the child under article 13(a) of the Hague

Convention, defeating his claim for return.  *See Baxter v. Baxter*, 324 F. Supp. 2d 536, 538 (D. Del. 2004).  We will reverse and remand.

## I.

Henry G. Baxter initiated this proceeding on May 13, 2004 by filing a petition in the District Court of Delaware seeking the expedited return of his five-year old son Torin to Australia.  The petition alleges that his wife, Jody Amanda Baxter, wrongfully retained Torin in the United States under the Convention, and that Torin's custody should be decided by an Australian court.

Although the parties disagree on the reasons for Mrs. Baxter and Torin's trip to Delaware, the factual background is straightforward.  On September 2, 2003, Mrs. Baxter and Torin traveled to the United States from Australia without Mr. Baxter. They took up residence at the home of Mrs. Baxter's mother and sister in Selbyville, Delaware.[1]  Within two weeks of her arrival, Mrs. Baxter commenced a relationship with Kelly Stidham, a local contractor working on a project at her mother's house. Fourteen days later, Mrs. Baxter and Torin moved in with Mr. Stidham.  A few days thereafter, Mrs. Baxter telephoned her husband in Australia and demanded a divorce.  Mrs. Baxter and Torin have since been living in the home of Mr. Stidham.

---

[1]Mrs. Baxter was born in Selbyville and has dual U.S. and Australian citizenship.

3

Before September 2003, Torin and his parents lived together as a family in Australia.[2]  Their lifestyle was itinerant. During the first four years of Torin's life, the family lived in several remote settlements in the Australian outback, and also spent a year in Ireland.  Mr. Baxter moved from job to job, and the family moved from place to place.  The Baxters' last home together was on Bathurst Island, an aboriginal community in the Tiwi Islands, in Australia's rugged Northern Territory.  By all accounts, their stay there was short and troubled.   The community was beset with problems, including petrol sniffing and domestic violence.   The couple eventually decided the environment was unsuitable for their child, and that Mrs. Baxter and Torin should leave Bathurst Island and travel to the United States to visit Torin's grandmother and aunt, whom the child had never met.

The parties dispute whether the purpose of the trip to Delaware was to relocate definitively in the United States or to visit relatives for a time while giving the family an opportunity to plot a new course.   The evidence demonstrates that Mrs. Baxter and Torin flew to the U.S. on one-way tickets, and that Mrs. Baxter took with her important personal and family

---

[2]Torin has four older half-siblings (Mr. and Mrs. Baxter had two children each from prior marriages) who live with their other parents in Western Australia.

documents.[3]  At the same time, they left behind in Australia with Mr. Baxter a large number of possessions, including personal effects and toys.

The District Court conducted a full evidentiary hearing where the parties and other witnesses testified.  Affidavits were entered into the record without objection.  Mr. Baxter testified that before learning of his wife's affair with Mr. Stidham, he had planned to rejoin his family in Delaware for the Christmas holidays.  He sent a letter to his employer on the Tiwi Islands asking for leave in December, and purchased an airplane ticket to the United States.  Mr. Baxter testified that he was open to the idea of looking for work in the U.S. during the trip, but that it might not prove feasible.  Otherwise, he claims the plan was that the family would probably return to Australia, once he found a new job and a new place for them to live.  The parties agree there was no talk of divorce or separation prior to Mrs. Baxter and Torin's departure.

---

[3]It is unclear why the Baxters decided to purchase one-way rather than round-trip tickets for Torin and Mrs. Baxter.  The record does not reveal whether the one-way tickets were less expensive, whether they were chosen because any return date was uncertain, or because Mrs. Baxter and Torin planned to remain in the United States indefinitely.  One year earlier, the family had bought round-trip tickets for a one-month stay, but the trip was cancelled.

For her part, Mrs. Baxter testified that the idea of the trip was to escape the troubled community on Bathurst Island while Mr. Baxter tried to establish a new business selling solar-powered water purifiers to remote outback dwellings. She testified that the move to the United States was "permanent, because [Mr. Baxter] didn't want to worry about us." On the other hand, she admitted that the plan was for Mr. Baxter to rejoin her and Torin in Delaware over Christmas. She also testified that "it wasn't until [she] met Mr. Stidham that everything changed and [she] decided to end [her] marriage and live with Mr. Stidham."

The testimony from Mrs. Baxter's family is also inconclusive about the trip's purpose. Her sister testified, based on telephone conversations prior to Mrs. Baxter and Torin's arrival, that the primary goal of the trip was to visit family, and that exploring the possibility of a move to the U.S. was secondary. Her mother, on the other hand, testified that "[Mrs. Baxter] and Torin were coming over to live, and to establish a home, education." Mrs. Baxter's mother enclosed a porch in her house to create a play space for Torin's benefit, indicating her expectation that the visit would be long-term.

The District Court found under the Hague Convention that Australia was the habitual residence of the child until the time of the move to Delaware. *Baxter*, 324 F. Supp. 2d at 538. The court noted that a purpose of the trip was to explore the possibility of a permanent move, but found there was no intent to resolve this matter until after Mrs. Baxter and Torin's arrival.

6

*Id.* at 539. Nevertheless, the court concluded that Mr. Baxter had consented to Torin's removal to the United States, defeating his claim for return of the child under the Hague Convention. *Id.* Mr. Baxter filed this timely appeal.

## II.

We have appellate jurisdiction under 28 U.S.C. § 1291. The District Court had subject-matter jurisdiction under 28 U.S.C. § 1331, as this action arose under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, 19 I.L.M. 1501, and its implementing legislation, the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA"). Under ICARA, state and federal district courts have concurrent original jurisdiction over actions arising under the Convention. 42 U.S.C. § 11603(a).

We review the District Court's findings of historical and narrative facts for clear error, but exercise plenary review over the court's application of legal precepts to the facts. *Delvoye v. Lee*, 329 F.3d 330, 332 (3d Cir. 2003); *Feder v. Evans-Feder*, 63 F.3d 217, 222 n.9 (3d Cir. 1995); *see also Beta Spawn, Inc. v. FFE Transp. Servs.*, 250 F.3d 218, 223 (3d Cir. 2001) ("This court has plenary review over the district court's choice and interpretation of legal standards, and its application of those standards to the facts of the case.").

### III.

The Hague Convention has two main purposes: "to secure the prompt return of children wrongfully removed to or retained in any Contracting State[,]" and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention, art. 1. Any person seeking the return of a child under the Convention may commence a civil action by filing a petition in a court where the child is located. 42 U.S.C. § 11603(b). More broadly, the Convention's procedures are designed to restore the status quo prior to any wrongful removal or retention, and to deter parents from engaging in international forum shopping in custody cases. *See Feder*, 63 F.3d at 221. The Convention is not designed to settle international custody disputes, but rather to ensure that cases are heard in the proper court. *See* Hague Convention, art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue.").

Under article 3 of the Convention, the removal or retention of a child is "wrongful" where:

> a. it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

8

> b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.  To obtain an order for the child's return, the petitioner bears the burden of proving by a preponderance of the evidence that the removal or retention was wrongful under article 3.  42 U.S.C. § 11603(e)(1)(A).  If this burden is met and the petition is filed within the appropriate time frame, the Convention requires courts to "order the return of the child forthwith."  Hague Convention, art. 12.

Wrongful removal or retention claims under article 3 of the Convention typically raise four issues for analysis: when the removal or retention at issue occurred, the country in which the child was habitually resident prior to the removal or retention, whether the removal or retention breached the custody rights of the petitioner, and whether the petitioner was exercising those custody rights at the time of the removal or retention.  *See Mozes v. Mozes*, 239 F.3d 1067, 1070 (9th Cir. 2001); *see also Feder*, 63 F.3d at 225 (holding wrongful retention inquiry centers on whether petitioner's custody rights under law of country of habitual residence were breached by the retention, and whether petitioner was exercising those rights at the time of the retention).  If the court finds wrongful removal or retention, the burden shifts to the respondent to prove an affirmative defense to the return of the child to the country of habitual residence under article 13 of the Convention.  The respondent

9

must prove the defense of consent or acquiescence to the removal or retention by a preponderance of the evidence, or the defense of a grave risk of harm by clear and convincing evidence. 42 U.S.C. § 11603(e)(2). The affirmative defenses are narrowly construed to effectuate the purposes of the Convention, and even finding an exception under article 13 does not automatically preclude an order of return. *See* Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10,494, 10,509 (Mar. 26, 1986); *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996).

## A.

Mr. Baxter contends on appeal that the District Court misapplied article 3 of the Convention by failing to give proper consideration to his wrongful retention claim. The court terminated its analysis after holding that Mr. Baxter consented to Torin's removal from Australia at the time of his departure. It did not address wrongful retention, even though this was the principal contention of Mr. Baxter's petition. The crux of Mr. Baxter's appeal is that his consent to Torin's trip to United States was conditional – given under the assumption that the family would reunite at Christmas and then in all likelihood return to Australia. He contends that his wife's decision to retain Torin permanently in Delaware was unilateral and breached his custody rights.

As a preliminary matter, the District Court ruled that Torin's habitual residence prior to the contested removal or

10

retention was Australia.  Although not an issue contested on appeal, the finding is supported by the record.  We have defined a child's habitual residence as "the place where he or she has been physically present for an amount of time sufficient for acclimatization and which has a 'degree of settled purpose' from the child's perspective."  *Feder*, 63 F.3d at 224; *Delvoye*, 329 F.3d at 332-333.  The inquiry "must focus on the child and consists of an analysis of the child's circumstances in that place and the parents' present, shared intentions regarding their child's presence there."  *Feder*, 63 F.3d at 224; *Delvoye*, 329 F.3d at 332-333.  On the facts here, Delaware does not qualify as Torin's habitual residence prior to removal.

The District Court found the Baxters disagreed whether the move to the United States was permanent or merely intended as a "first step [towards] finding a suitable residence for the child outside Australia."  *Baxter*, 324 F. Supp. 2d at 539.  The finding that the Baxters had decided to leave Australia definitively is unsupported and will be set aside as clearly erroneous.  The finding is belied by the court's own conclusions that Australia remained the country of habitual residence at the time of removal, and that the Baxters were undecided about their next residence.  (The court found: "It is clear from the evidence that the parties did not intend to resolve this question in any event until after Respondent and the Child had moved to the United States.")  *Id.*  The only uncontradicted record evidence of settled intent by the parties was to move away from the harsh circumstances of the Tiwi Islands.  At the time of Mrs. Baxter

11

and Torin's departure in September 2003, nothing in the record indicates that a subsequent return to Australia, to a more tolerable location for Torin, had been ruled out. The record establishes that the parties saw the trip in the first instance as an opportunity to escape from the disagreeable circumstances of Bathurst Island, to visit family, and to buy time to plan their next move. This falls short of the "settled purpose" required under the Convention for a finding that the country of habitual residence has been abandoned.

After addressing habitual residence, the District Court proceeded directly to examine Mrs. Baxter's affirmative defense of consent without analyzing the remaining elements of Mr. Baxter's article 3 claim. *See* Hague Convention, art. 3; *Mozes*, 239 F.3d at 1070 (noting that article 3 raises four issues for courts to determine: when the removal or retention at issue occurred, the country of habitual residence, whether the removal or retention breached petitioner's custody rights, and whether petitioner was actually exercising those custody rights at the time of the removal or retention). The District Court's analysis focused only on the circumstances of the departure from Australia (removal), not Mrs. Baxter's subsequent decision to remain permanently in Delaware with Torin (retention). The court's focus was too narrow. As noted, the crux of Mr. Baxter's claim was wrongful retention, not wrongful removal (the relevant heading in his petition was titled "The Removal and Wrongful Retention of Torin").

12

Nor did the District Court address whether Torin's removal or retention breached Mr. Baxter's custody rights under Australian law, or whether Mr. Baxter "actually exercised" his custody rights at the time of the removal or retention.[4]  Hague Convention, art. 3.  Mrs. Baxter does not dispute that Mr. Baxter has rights of joint custody over Torin under Australian law. Furthermore, the record demonstrates that Mr. Baxter "actually exercised" his custody rights under article 3 at the time of the removal and retention.  Mrs. Baxter alleged in her pre-hearing submission that after their arrival in Delaware, her husband "provided no financial support and his only contact with his son consisted of infrequent phone calls."  But they had only been gone a few weeks before Mrs. Baxter told her husband she had decided to remain in Delaware with Torin.  Reduced contact or lack of financial support over such a short period of time is

---

[4]Article 14 of the Convention permits courts to take judicial notice of the law of the country of habitual residence in answering these questions.  *See* Hague Convention, art. 14 ("In ascertaining whether there has been a wrongful removal or retention within the meaning of Article 3, the judicial or administrative authorities of the requested State may take notice directly of the law of, and of judicial or administrative decisions, formally recognized or not in the State of the habitual residence of the child, without recourse to the specific procedures for the proof of that law or for the recognition of foreign decisions which would otherwise be applicable."); *see also Mozes v. Mozes*, 239 F.3d 1067, 1085 (9th Cir. 2001).

13

insufficient under the Convention to demonstrate that a parent has ceased exercising custody rights.  Prior to their departure, the Baxters lived together as a family and there was no allegation of non-support.  Moreover, as with the article 13(a) defenses of consent and acquiescence (discussed in Part III. B, *infra*), the test for finding the non-exercise of custody rights under the Hague Convention is stringent.  *See Friedrich*, 78 F.3d at 1065-1066 ("The only acceptable solution, in the absence of a ruling from a court in the country of habitual residence, is to liberally find 'exercise' whenever a parent with *de jure* custody rights keeps, or seeks to keep, any sort of regular contact with his or her child . . . . [I]f a person has valid custody rights to a child under the law of the country of the child's habitual residence, that person cannot fail to 'exercise' those custody rights under the Hague Convention short of acts that constitute clear and unequivocal abandonment of the child."); *see also Sealed Appellant v. Sealed Appellee*, 394 F.3d 338, 344-45 (5th Cir. 2004).

In holding that Mr. Baxter consented to Torin's removal, the District Court relied on its finding that Mr. and Mrs. Baxter "agreed it was in the best interests of the Child to remove the Child to the United States."  *Baxter*, 324 F. Supp. 2d at 538.  The court pointed to the family's negative experience in the Tiwi Islands, the purchase of one-way tickets, taking the family documents, and hiring the contractor to enclose the porch of the house in Delaware as facts pointing to consent to removal.  *Id.* at 538-39.  But the court did not address the nature or scope of

14

Mr. Baxter's consent. Nor did it address whether Mr. Baxter consented to or even contemplated his wife's permanent retention of Torin in Delaware.

Mrs. Baxter contends that under the Convention, once a court finds the petitioner has consented to the child's initial removal, the inquiry ends and there is no need to address retention. This argument is based on the text of article 13(a)'s provision that a child need not be returned if the petitioner "had consented to or subsequently acquiesced in the removal or retention." Mrs. Baxter contends that analyzing retention as well as removal would amount to rewriting article 13(a) to read "... in the removal *and* retention."

This argument misreads the Convention. The words "removal or retention" refer to whichever may be relevant to the case at hand, and create a multiple, not alternative, obligation. In other words, the use of the word "or" in article 13(a) of the Convention is not disjunctive in the sense of indicating an alternative between mutually exclusive things. *See Wanninger v. Wanninger*, 850 F. Supp. 78, 82 (D. Mass. 1994) ("The Hague Convention covers both wrongful removal and wrongful *retention*.") (emphasis in original).[5] Article 13(a) does

---

[5]*Wanninger* presented facts similar to this case. The petitioner allowed his children to travel to the United States for summer vacation and the respondent kept them here once it became clear their marriage would end. The court held that "even accepting Catherine's position that Manfred consented to

not provide that if a parent consents to removal of the child for a period, under certain conditions or circumstances, that retention of the child beyond those conditions or circumstances is necessarily permissible. *See, e.g., Doudle v. Gause*, 282 F. Supp. 2d 922, 929 (N.D. Ind. 2003) ("[E]ven if the Respondent intended to remove the children for a maximum of one year, her actions since 2000 have exceeded the scope of Petitioner's consent and she is wrongfully retaining the children in the U.S."). Article 3 proscribes wrongful removal and/or wrongful retention, as applicable. The inquiry does not necessarily end with the petitioner's consent to the child's removal. If the petitioner agrees to a removal under certain conditions or circumstances and contends those conditions have been breached, the court must also examine any wrongful retention claim.

## B.

Mr. Baxter also contends that the District Court erred by interpreting the Hague Convention's affirmative defense of consent in article 13(a) too broadly. The defense provides that

---

her taking the children to the United States for a limited period, it does not follow that Manfred acquiesced to the children's permanent retention in the United States once he realized that his marriage was irreconcilable . . . . The sequence of events and actions taken by Manfred strongly supports the conclusion that Manfred did not agree that the children remain in the United States for an indefinite period of time." 850 F. Supp. at 82.

16

"the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that . . . the person, institution or other body having care of the person of the child . . . had consented to or subsequently acquiesced in the removal or retention[.]"  Hague Convention, art. 13(a).  As noted, the District Court ruled that Mrs. Baxter proved by a preponderance of the evidence that Mr. Baxter consented to Torin's removal to Delaware, defeating his claim for return.  *Baxter*, 324 F. Supp. 2d at 538.  We believe the court misconstrued the consent defense in this case.

Although analytically distinct, the defenses of consent and acquiescence under article 13(a) of the Hague Convention are both narrow.  *See* 42 U.S.C. § 11601(a)(4); 51 Fed. Reg. at 10,509; *Feder*, 63 F.3d at 226.  The consent defense involves the petitioner's conduct prior to the contested removal or retention, while acquiescence addresses whether the petitioner subsequently agreed to or accepted the removal or retention.  *See Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001).  Although the law construing the consent defense under the Convention is less developed, the defense of acquiescence has been held to require "an act or statement with the requisite formality, such as testimony in a judicial proceeding; a convincing written renunciation of rights; or a consistent attitude of acquiescence over a significant period of time."  *Friedrich*, 78 F.3d at 1070 (internal footnotes omitted).  Courts have held the acquiescence inquiry turns on the subjective intent of the

17

parent who is claimed to have acquiesced.  *See Pesin v. Osorio Rodriguez*, 77 F. Supp. 2d 1277, 1288 (S.D. Fla. 1999) (citing *Friedrich*, 78 F.3d at 1060, *Wanninger*, 850 F.Supp. at 81-82, and cases from the high courts of the United Kingdom and France).

Consent need not be expressed with the same degree of formality as acquiescence in order to prove the defense under article 13(a).  Often, the petitioner grants some measure of consent, such as permission to travel, in an informal manner before the parties become involved in a custody dispute.  The consent and acquiescence inquiries are similar, however, in their focus on the petitioner's subjective intent.  In examining a consent defense, it is important to consider what the petitioner actually contemplated and agreed to in allowing the child to travel outside its home country.  The nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account.  The fact that a petitioner initially allows children to travel, and knows their location and how to contact them, does not necessarily constitute consent to removal or retention under the Convention.  *See Fabri v. Pritikin-Fabri*, 221 F. Supp. 2d 859, 871-72 (N.D. Ill. 2001) ("Many cases begin with a parent's taking the child away from home for a vacation or visit with the consent of the other parent, but nevertheless result in a Hague Convention order compelling the child's return"); *see also Ciotola v. Fiocca*, 86 Ohio Misc. 2d 24, 29 (Ct. Com. Pl. 1997) (ordering return of child to Italy after petitioner allowed respondent to take child to family wedding in

18

Ohio); *Renovales v. Roosa*, 1991 WL 204483, at *1-2 (Conn. Super. Ct. Sep. 27, 1991) (ordering return of child to Spain after petitioner allowed respondent to take child to her parents' home in Connecticut for summer vacation).

Mrs. Baxter argues this case more closely resembles *Gonzalez-Caballero v. Mena*, where the Court of Appeals for the Ninth Circuit upheld a finding of consent under the Convention and denied a petition for return. *See* 251 F.3d at 794. But its facts are inapposite. In *Gonzalez-Caballero*, it was clear that petitioner had consented to her child's removal and retention. The parents had concluded the child "would have a better life in the United States" and should immigrate to be with respondent, an American citizen. *Id.* at 791. The petitioner had told respondent that she could no longer care for the child because she was pregnant and her boyfriend had left her. *Id.* She only petitioned for the child's return after "regretting her decision" to allow her daughter to be removed to the United States. *Id.* at 793. The *Gonzalez-Caballero* court parsed through eight separate factual grounds evidencing consent, *id.*, of which only one (taking the child's personal documents) is present in this case.

There is no similar factual basis for finding consent here. As noted, it is clear that Mr. Baxter consented to Torin's visit to Delaware for a limited period of time, under certain circumstances and conditions. But nothing in the record demonstrates that he consented to the child's permanent retention in the United States, or to Mrs. Baxter making

19

unilateral decisions regarding Torin's future.  Nor is there evidence that Mr. Baxter acquiesced to the present arrangement. Record testimony from both parties supports Mr. Baxter's contention that his consent was limited and conditional.  Both parties testified the marriage was intact when Mrs. Baxter and Torin left Australia, and that the plan was for Mr. Baxter to rejoin them in Delaware for a visit at Christmas.  Both parties testified they contemplated the possibility of relocating to the United States together as a family at some point, depending on Mr. Baxter's job prospects and other factors, but agree that no firm plan was in place as of September 2003.  Since learning of Mrs. Baxter's decision to retain Torin in the Delaware and raise him with Mr. Stidham, Mr. Baxter has vigorously objected and pursued his rights under the Convention.  In sum, the record demonstrates that Mr. Baxter agreed to Torin staying at his grandmother's house in Delaware for a few months while the family figured out its next move, but it is unclear that he agreed to anything beyond that.  This intent falls short of the standard for finding consent under article 13(a) of the Convention.

The record demonstrates that Mrs. Baxter did not decide to stay in Delaware until she arrived there and met Mr. Stidham. Mrs. Baxter testified that "it wasn't until [she] met Mr. Stidham that everything changed and [she] decided to end [her] marriage and live with Mr. Stidham."  The District Court described this central development merely as "an intervening event . . . affect[ing] the amicable resolution of this question," but that "for purposes of the legal issue presented, cannot alter

20

Petitioner's consent to the removal of the Child from Australia to the United States." *Baxter*, 324 F. Supp. 2d at 539. We disagree. Mrs. Baxter's decision represented a change in plan from what she and Mr. Baxter had agreed upon before departing to Delaware. It was clear error for the District Court to find otherwise.

## C.

As an alternative holding, the District Court concluded that ordering Torin's return to Australia would expose him to the risk of physical or psychological harm or otherwise place him in an intolerable situation under article 13(b) of the Convention.[6] *Id.* at 539-40. The District Court found the parties' testimony established that the living environment in Australia was intolerable. *Id.* at 539. The District Court took into account the fact that Mr. Baxter established a new home in Perth, a major city, but found "this evidence is insufficient to persuade me that returning the Child to Australia at this time would not expose the Child to the grave risk of physical or

---

[6]Article 13(b) provides: "Notwithstanding the provisions of the preceding Article, the judicial or administrative authority of the requested State is not bound to order the return of the child if the person, institution or other body which opposes its return establishes that there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an untolerable situation."

21

psychological harm that lead to the decision to move the Child to the United States." *Id.* at 539-40.

The affirmative defense of grave risk of harm requires proof by clear and convincing evidence. 42 U.S.C. § 11603(e)(2)(A); *see also Silverman v. Silverman*, 338 F.3d 886, 900 (8th Cir. 2003). The exception has been held to apply in at least two sets of cases: "when return of the child puts the child in imminent danger . . . *e.g.,* returning the child to a zone of war, famine, or disease . . . [and in] cases of serious abuse or neglect, or extraordinary emotional dependence, when the court in the country of habitual residence, for whatever reason, may be incapable or unwilling to give the child adequate protection." *Friedrich*, 78 F.3d at 1069. The Court of Appeals for the Second Circuit has characterized the exception as follows:

> At one end of the spectrum are those situations where repatriation might cause inconvenience or hardship, eliminate certain educational or economic opportunities, or not comport with the child's preferences; at the other end of the spectrum are those situations in which the child faces a real risk of being hurt, physically or psychologically, as a result of repatriation. The former do not constitute a grave risk of harm under Article 13(b); the latter do.

22

*Blondin v. Dubois*, 238 F.3d 153, 162 (2d Cir. 2001).[7]

The facts of this case fall short of demonstrating a clear and grave risk of harm. For the grave harm exception to apply,

---

[7]The United States Department of State has offered similar guidance about the exception, also construing it narrowly:

> A review of deliberations on the Convention reveals that "intolerable situation" was not intended to encompass return to a home where money is in short supply, or where educational or other opportunities are more limited than in the requested State. An example of an "intolerable situation" is one in which a custodial parent sexually abuses a child. If the other parent removes or retains the child to safeguard it against further victimization, and the abusive parent then petitions for the child's return under the Convention, the court may deny the petition. Such action would protect the child from being returned to an "intolerable situation" and subjected to a grave risk of psychological harm.

51 Fed. Reg. at 10,510. Although not conclusive, the meaning attributed to treaty provisions by the government agencies charged with their negotiation and enforcement is entitled to great weight. *United States v. Stuart*, 489 U.S. 353, 369 (1989).

23

the respondent must cite specific evidence of potential harm to the child upon his return.  *See Silverman*, 338 F.3d at 900.[8] None has been presented here.  There are no allegations of abuse by either parent.  The only record testimony supporting the grave risk of harm exception involves the unpleasant experiences the family endured on Bathurst Island before Mrs.

---

[8]The Court of Appeals for the First Circuit addressed the quantum of proof required:

> To meet her burden under the article 13(b) exception, the respondent must establish that the alleged physical or psychological harm is "a great deal more than minimal."  Indeed, the harm must be "something greater than would normally be expected on taking a child away from one parent and passing him to another."  Courts are not to engage in a custody determination or to address such questions as who would be the better parent in the long run.

*Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000) (quoting *Walsh v. Walsh*, 221 F.3d 204, 218 (1st Cir. 2000)).  *Walsh* held that the standard for proving grave risk had been set too high in a case involving a pattern of violence by the petitioner, and his chronic disobedience of court orders in the home country.  There is no evidence of any such pattern of conduct by Mr. Baxter in the present case.

24

Baxter and Torin left for Delaware. These included run-ins with hostile residents, and the stress of living in a community troubled by racial and domestic violence and petrol sniffing.[9] But this testimony is of limited relevance here because Mr. Baxter no longer resides on Bathurst Island, or anywhere near the Tiwi Islands – he now lives in Perth, a major city on Australia's southwestern coast. The inquiry into grave risk of harm focuses on the present living situation to which the child would be returned. The living situation prior to the removal or retention may of course be relevant, but not where the family decided jointly to leave, and the petitioner has since relocated.

## IV.

We conclude the District Court erred by applying the Hague Convention's exceptions under articles 13(a) and 13(b) on the facts of this case. We will reverse the order denying Mr. Baxter's petition, and remand for entry of an order granting the

---

[9]The record also includes several unsupported allegations between the parties regarding their respective fitness as parents. Mrs. Baxter claims that Mr. Baxter is an alcoholic who was once involved with an illegal mercenary army in Papua New Guinea, while Mr. Baxter disparages Mrs. Baxter as "a first-nighter." The District Court made no findings with respect to these allegations. Assessment and disposition of these kinds of allegations are normally reserved for a custody proceeding. As noted, the Convention addresses jurisdiction and not the merits of custody disputes. *See* Hague Convention, art. 19.

petition for return to the country of habitual residence.  We leave it to the sound discretion of the District Court to decide the details of that return, including costs.